[No. 78321-7. En Banc.]
Argued February 13, 2007. Decided September 20, 2007.

MICHAEL L. OLVER, *as Special Administrator, Respondent*,
v. JULIE K. FOWLER, *as Special Administrator*, ET AL.,
*Petitioners*.

*Terry J. Barnett* and *Stanley J. Rumbaugh* (of *Rumbaugh Rideout Barnett & Adkins*), for petitioners.

*Michael L. Olver* (of *Betts Patterson & Mines, PS*), for respondent.

¶1 BRIDGE, J. — Cung Ho's and Thuy Nguyen Ho's 14-year relationship ended when they and several others were killed in a car accident. We must determine whether the trial court abused its discretion when it allowed a party asserting a tort claim against the couple's property to intervene in an action between their estates. We must also determine whether Washington's law of meretricious[1] or committed intimate relationships can be applied where both partners are deceased. Finally, the intervenor asks that we resolve whether tort claims against one committed

---

[1] While this court has previously referred to such relationships as "meretricious," we, like the Court of Appeals, recognize the term's negative connotation. *See Peffley-Warner v. Bowen*, 113 Wn.2d 243, 247 n.5, 778 P.2d 1022 (1989); *Olver v. Fowler*, 131 Wn. App. 135, 140 n.9, 126 P.3d 69 (2006). Accordingly, we too substitute the term " 'committed intimate relationship,' " which accurately describes the status of the parties and is less derogatory. *Olver*, 131 Wn. App. at 140 n.9.

intimate partner may be made against the other partner's estate under a theory of joint tort liability.

¶2 We agree with the well reasoned and thoughtful analysis of the Court of Appeals. The trial court did not abuse its discretion when it granted intervention. The law of committed intimate relationships can be applied to divide assets between committed partners' estates where both partners are deceased. Finally, neither the trial court nor the Court of Appeals addressed whether principles of joint tort liability extend to committed intimate partners in this case, concluding instead that the more appropriate forum for resolution of that issue was the separate suit filed against Thuy Nguyen Ho's estate. For the same reasons, we too decline to address this issue.

## I

### Facts and Procedural History

¶3 The parties do not dispute that Cung Ho (Cung) and Thuy Nguyen Ho (Thuy) lived in a committed intimate relationship for at least 14 years, and they had two children together, Harry and Rebecca Ho.[2] Thuy and Cung began living together in 1988 or 1989, they had a religious wedding ceremony in 1990, and they presented themselves to the community as husband and wife, though they were never legally married. Their children were born in 1991 and 1992. Cung and Thuy both worked full time developing and running the family business. They pooled their money and purchased assets, which they titled in Cung's name according to custom in their culture. They were jointly listed on their automobile insurance policy. In Cung's will, he referred to Thuy as his wife.

¶4 In July 2003, the Ho family went on vacation in Idaho with Duong Nguyen, Kathy Nguyen, and Kathy's two

---

[2] Because so many people related to this action share surnames, we refer to each by his or her first name.

children, Dalena and Dianna. On the morning of July 4, they were all traveling together in a large SUV (sports utility vehicle) driven by Cung. According to the accident report, Cung swerved left to avoid colliding with cars that had stopped in front of him. He crossed the center line and collided head on with an oncoming car. Cung, Thuy, their daughter Rebecca, Duong, Kathy, and her daughter Dalena were all killed. Cung and Thuy, who were in seats on the left side of the SUV, were both killed instantly. Harry and Dianna were the only survivors in the SUV. The driver and the passenger in the other car both survived. Dianna's father, Vu Nguyen, was not in the car.

¶5 Julie Fowler was appointed special administrator of Cung's estate, while Michael Olver was appointed special administrator of Thuy's estate. Fowler submitted to the King County Superior Court a probate asset inventory appraisement, which included all assets to which Cung held title. The assessment included the Ho family residence, the family business, three rental properties, several investment and bank accounts, life insurance, household furniture, and two cars. The real property was valued at approximately $716,250, the investment and banking accounts were valued at approximately $269,361, and the remaining property was valued at approximately $37,688. Thus, the property to which Cung held title at the time of his death was valued at approximately $1,023,300. The record reflects that Thuy's estate contained $2,893 in cash and checks that were in Thuy's purse at the time of her death. It is unclear from the record what else was in Thuy's estate, but the parties do not dispute that the vast majority of the couple's assets had been titled in Cung's name.

¶6 Cung left a will leaving his entire estate to Thuy. Thuy's will is not in the record, but documents in the record state that she left all of her estate to Cung. Neither provided for an alternate beneficiary. No party disputes that once the contents of each estate are established, intestacy will control their distribution.

¶7 Olver, as personal representative of Thuy's estate, filed a contradiction of inventory, arguing that Cung and Thuy were partners in a committed intimate relationship when they died and Thuy's estate was entitled to an equitable interest in all property acquired during that relationship. Olver asked that at least one-half of the inventoried property in Cung's estate be transferred to Thuy's estate. Olver then filed a motion for summary judgment.

¶8 The trial judge granted summary judgment in part, finding a committed intimate relationship but leaving the equitable division of the property for trial. Then, a court commissioner revoked nonintervention powers in Cung's probate estate and ordered the parties into mediation, which the parties agreed would be binding. The commissioner required Thuy's estate to present prima facie evidence that the inventoried assets were acquired during the committed relationship.

¶9 The mediator found that neither Cung nor Thuy owned substantial assets prior to their union and all of the assets inventoried in Cung's estate were acquired jointly during the committed intimate relationship. The couple's property was titled in Cung's name, an established practice in the Vietnamese culture. Neither party received substantial separate property after they began living together. The mediator concluded that 50 percent of the assets in Cung's estate should be transferred to Thuy's estate. The mediator asked the parties to prepare the necessary order for presentation to the superior court.

¶10 Following the mediator's directive, Olver sought to present corresponding findings of fact, conclusions of law, and a judgment disbursement in the superior court. On the day that judgment was entered, Vu, Dianna's father,[3]

---

[3] The same attorneys represent Dianna, as well as the estate of her deceased sister Dalena, and the girls' father, Vu, all of whom apparently attempted to file creditors' claims against the estates of Cung and Thuy. There is no evidence formally in the record in this case regarding the current status of these claims. However, at oral argument, Olver submitted a copy of an order barring Dianna's

objected on Dianna's behalf, contesting the findings, con-
clusions, and disbursement. Specifically he argued that the
law does not allow application of the meretricious relation-
ship doctrine (hereafter referred to as Washington's law of
committed intimate relationships), where both partners are
deceased. He also argued that applying the doctrine here
would be unjust to Dianna because it could theoretically
shield some of Cung's assets from her reach. Finally, he
asserted that if the doctrine did apply, it should not prevent
Dianna from gaining access to those assets if she were to
prevail in her liability claim. On the day before oral
argument on these issues, Vu filed a formal motion to
intervene.

¶11 The trial judge considered briefing and oral argu-
ment and granted the motion to intervene. But the trial
court declined to amend the findings of fact, conclusions of
law, and judgment. The trial judge concluded that Cung
and Thuy lived in a committed intimate relationship from
1988 or 1989 until their deaths in 2003, and each of their
estates was entitled to an undivided 50 percent interest in
all assets inventoried in Cung's estate. The trial judge also
explained that the legal effect of the committed intimate
relationship upon a tort creditor's claim should be deter-
mined in the context of the liability case. The trial judge
ordered that one half of the property inventoried in Cung's
estate be disbursed to Thuy's estate.

¶12 Vu appealed, arguing that the trial court erred as a
matter of law by disbursing Cung's property according to
committed intimate relationship equity after both partners
had died. Vu also asserted that even if the doctrine *could* be
applied upon the death of both partners, it should not be
applied in this case because doing so served the sole
purpose of putting property beyond Dianna's reach. Finally,
Vu argued that the trial court should have made it clear
that Thuy's estate could be subject to joint liability for

creditor's claim against the estate of Thuy. Order Barring Creditor's Claim at 1.
The record also indicates that in 2004, the claims of Vu and the estate of Dalena
were being contested.

Cung's negligence. Olver cross appealed, arguing that the trial court erred as a matter of law when it granted Vu's motion to intervene.

¶13 The Court of Appeals concluded that the trial court did not abuse its discretion when it permitted Vu to intervene. *Olver v. Fowler*, 131 Wn. App. 135, 140, 126 P.3d 69 (2006). The court then held that "where unmarried, committed intimate partners are separated by death, as when they separate during life, any property acquired during the relationship that would have been community property [had the parties been married] is jointly owned and subject to a just and equitable division" between their estates. *Id.* at 146. Once their jointly acquired property is equitably divided, *then* the relevant wills or statutes operate on each estate. *Id.* at 145. Finally, because the trial court did not rule on the issue, the Court of Appeals declined to decide whether assets in the estate of one partner are subject to joint tort liability where the partners were engaged in a committed intimate relationship, deferring resolution of this issue to the suit against Thuy's estate. *Id.* at 146 n.41.

¶14 Vu filed a petition for review in this court. In his answer, Olver again argued that the trial court erred when it allowed Vu to intervene.[4] We granted review of the issues raised by both parties. *Olver v. Fowler*, 158 Wn.2d 1006, 143 P.3d 829 (2006).

## II

### Analysis

■ ¶15 *Intervention*: On the day that findings of fact, conclusions of law, and a judgment were entered in this case, Vu sought to contest the equitable division of Cung and Thuy's property on behalf of his surviving daughter,

---

[4] Vu filed a reply to Olver's cross petition, but pursuant to RAP 13.4(d), we consider *only* the arguments contained therein that respond to issues raised in the answer.

Dianna. The trial judge granted his motion to intervene. The Court of Appeals affirmed, finding that the trial court did not abuse its discretion. *Olver*, 131 Wn. App. at 140. In this court, Olver asserts that Vu's motion to intervene was untimely. CR 24(a) provides:

> Upon *timely* application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(Emphasis added.) *See also Westerman v. Cary*, 125 Wn.2d 277, 303, 892 P.2d 1067 (1994). Postjudgment intervention requires a strong showing that intervention is necessary considering all of the circumstances including prior notice, prejudice to the other parties, and reasons for the delay. *Kreidler v. Eikenberry*, 111 Wn.2d 828, 833, 766 P.2d 438 (1989).[5]

¶16 An appellate court will review a trial court's evaluation of timeliness only for abuse of discretion. *Id*. at 832. Abuse of discretion occurs where the trial court's action is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). A " ' "manifestly unreasonable" ' " decision results if " 'the court . . . adopts a view "that no reasonable person would take." ' " *Id*. at 424 (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990))).

---

[5] The parties disagree as to whether Vu objected to the proposed judgment before or after it was entered. Vu's motion for oral argument to contest the presentation of the judgment was filed on September 7, 2004, the day that judgment was entered. On September 15, 2004, the trial court granted the motion for oral argument and explained that the court had entered its judgment before Vu's motion was noted. The court then treated the issue as whether the judgment should be amended.

■ ■ ¶17 Although the trial judge expressed some concern as to why Vu did not actively participate earlier, Vu's counsel offered some plausible reasons as to why he waited. First, because he had earlier intervened in Cung's estate, he arguably had already established an interest in the case. Report of Proceedings (RP) at 3-4, 15. And while the trial court inquired as to why Vu did not move to take part in the mediation on the equitable division of the couple's property, counsel explained that until the mediation was completed, his interests and those of Cung's estate had been aligned in this matter. RP at 5, 9. Vu's arguments were legal ones, and counsel raised those issues once it became clear that a decision adverse to his client had been made. In addition, RCW 11.44.035 provides that "[a]ny party in interest in the estate may challenge the inventory and appraisement *at any stage of the probate proceedings.*" (Emphasis added.) As the trial court and Court of Appeals noted, we liberally construe our rules in favor of intervention. *Columbia Gorge Audubon Soc'y v. Klickitat County*, 98 Wn. App. 618, 623, 989 P.2d 1260 (1999) (citing *Loveless v. Yantis*, 82 Wn.2d 754, 759, 513 P.2d 1023 (1973)). We cannot say that no reasonable person would have adopted the view of the trial court. Olver has not established that the trial court abused its discretion, and we therefore affirm the Court of Appeals.

¶18 *Application of the Law of Committed Intimate Relationships Where Both Partners Have Died*: The equitable law governing the property of committed intimate partners has evolved over the past 90 years. No Washington case has addressed the division of property between the estates of two deceased committed intimate partners. However over the years, several cases have considered property distribution where one partner has died, the deceased partner was titleholder to property, and the living partner asserted an equitable interest in that property.

¶19 In *In re Brenchley's Estate*, 96 Wash. 223, 223-24, 164 P. 913 (1917), Richard Brenchley divorced his first wife and then married his second within six months of the

divorce. Under the law at the time, the second marriage was void. *Id*. But the Brenchleys lived together as husband and wife for 26 years, both believing they were legally married. *Id*. at 226. When Mr. Brenchley died, his second wife argued that even though the marriage was void, she was entitled to a one-half interest in all of the property acquired as a result of the couple's joint efforts. *See id*. This court agreed, reasoning that if the deceased were alive, he would not be allowed to take advantage of his own mistake by taking all of the property acquired through joint efforts. *Id*. While the *Brenchley* court dealt with a good faith belief that the parties were indeed married, the court reasoned that Mr. Brenchley's heirs had "no better rights than their father would have were he now alive." *Id*.

¶20 Then in 1948, this court again considered the division of jointly acquired property where the partners lived in a committed intimate relationship, but only the deceased female partner held title to the disputed property. *Creasman v. Boyle*, 31 Wn.2d 345, 347-50, 196 P.2d 835 (1948). Emphasizing testamentary freedom, the *Creasman* court held that in the absence of any evidence to the contrary, "property acquired by a man and a woman, not married to each other, but living together as husband and wife, must be regarded as belonging to the one in whose name the legal title stands." *Id*. at 358. The *Creasman* court concluded that because the real property and account at issue were titled in the name of the deceased female partner, "they must both be regarded as belonging to her estate." *Id*. Notably, the *Creasman* court also treated the division of property between the intimate partners as an initial question of what property would become part of the decedent's estate. *See id*.

¶21 In subsequent cases, this court distinguished *Creasman* and began to question the validity of its presumption. *Latham v. Hennessey*, 87 Wn.2d 550, 553-55, 554 P.2d 1057 (1976) (noting that this court had developed numerous exceptions to the *Creasman* presumption to avoid inequitable results and indicating a willingness to

overrule it); *In re Estate of Thornton*, 81 Wn.2d 72, 76-77, 81, 499 P.2d 864 (1972) (recognizing that a living intimate partner could demonstrate an implied partnership existed despite the *Creasman* presumption). In 1984, in *In re Marriage of Lindsey*, 101 Wn.2d 299, 304, 678 P.2d 328 (1984), we finally overruled the *Creasman* presumption. In its place, the *Lindsey* court listed several factors to consider when determining whether a committed intimate relationship existed. *Id.* at 304-05. If such a relationship existed, then the court could apply community property law by analogy: property acquired jointly during the relationship could be equitably divided between the partners, even if only one partner held title. *See id.* at 306-07. While *Lindsey* involved dissolution, rather than the death of a partner, it overruled *Creasman* without limitation. *See id.* at 304.[6]

¶22 After *Lindsey*, the Ninth Circuit Court of Appeals asked this court to determine whether Washington law would afford the surviving partner of a 22-year, committed intimate relationship the same status as a spouse with respect to the *intestate devolution* of the deceased partner's personal property. *Peffley-Warner v. Bowen*, 113 Wn.2d 243, 244-45, 778 P.2d 1022 (1989). In that case, the probate court had deemed the partners' home to be the separate property of the deceased Mr. Warner, but the court granted an equitable lien against the property in the amount of $1,500 to the surviving partner, a judgment that this court never questioned. *Id.* at 247. In the federal courts, the surviving partner was seeking "widow" status for the purpose of acquiring Mr. Warner's social security benefits, a status she could gain if she could show that she had the same status as a spouse under Washington law of intestacy. *Id.* at 248-49.

¶23 The *Peffley-Warner* court held that while a committed intimate partner can take an equitable share of property acquired jointly during the relationship, he or she is

---

[6] In *Lindsey*, the partners lived together in a committed intimate relationship and jointly improved a barn/shop during the two years before they were married. *Lindsey*, 101 Wn.2d at 300. The *Lindsey* court had to determine, in part, whether Lana Lindsey had an equitable interest in the barn/shop. *Id.* at 307.

not a spouse and cannot take a spouse's *intestate* share of the deceased partner's estate. *Id.* at 252. In doing so, the *Peffley-Warner* court reasoned:

> *Lindsey* involved *equitable* division of property following breakup of a relationship where the parties had cohabited for several years before their 5 years of marriage. *Lindsey* states that courts must examine the relationship and the property accumulations and make a just and equitable distribution. By overruling *Creasman* (involving intestate property distribution) *Lindsey* did not expand the rights of a surviving partner in an unmarried cohabiting relationship to the personal property of a deceased partner. *Lindsey* merely overruled *Creasman* to the extent that *Creasman* had established a presumption that property acquired by a couple in an unmarried relationship is not community property and belongs to the person with legal title. The court merely recognized the contributions made by both parties to the purchase and maintenance of property and, through an equitable division of the property or analogous compensation, sought to avoid unjust enrichment of one partner at the expense of the other.

*Id.* The *Peffley-Warner* court acknowledged that the probate court had recognized a committed intimate relationship and had awarded Ms. Peffley-Warner a lien on Mr. Warner's house in recognition of the " 'equities of [their] relationship during the time of the acquisition of the property.' " *Id.* But the court held that Ms. Peffley-Warner could not take an *intestate* share of Mr. Warner's estate because she was neither a surviving spouse nor an heir. *Id.* at 253.[7]

¶24 Then, relying in part on *Peffley-Warner*, we later clarified that while a *spouse's* community *and* separate

---

[7] The dissent ignores the *Peffley-Warner* court's distinction between equitable division of property jointly acquired during the relationship and the distribution of property that was owned by the deceased partner by way of intestacy. As discussed in more detail below, this case involves the initial distribution of jointly acquired property between committed intimate partners.

We note, however, that very recently the legislature extended Washington's law of intestacy to cover unmarried registered domestic partners. SUBSTITUTE S.B. 5336, 60th Leg., Reg. Sess. § 27 (Wash. 2007) (effective July 27, 2007). Only same sex couples and couples in which one or both partners are above 62 years of age may register as domestic partners under the new law. *Id.* § 1.

property is subject to equitable distribution, where a couple remains unmarried, only the property acquired *jointly during the relationship* can be equitably divided to prevent unjust enrichment. *Connell v. Francisco*, 127 Wn.2d 339, 349-50, 898 P.2d 831 (1995). Thus, we limited equitable distribution to property that would have been community property had the partners been married; separate property cannot be reached by the nontitleholding partner. *Id.* at 350. Thus, this court has not extended all of the rights of married spouses to unmarried partners.

¶25 Most recently, in *Vasquez v. Hawthorne*, 145 Wn.2d 103, 104-05, 33 P.3d 735 (2001), we considered equitable property distribution between two partners who had allegedly been in a committed intimate same sex relationship before one partner died. The trial court had awarded the surviving partner the property acquired during the relationship, holding this property was not part of the deceased partner's estate. The Court of Appeals reversed, holding that the law of committed intimate relationships could not be applied to couples of the same sex who could not have legally married. *Id.* at 105. On review, we found sufficiently genuine issues of material fact to require trial and remanded to the trial court for determination of whether any of the surviving partner's bases for equitable remedies, including the law of committed intimate relationships, could be proved. *Id.* at 107. In doing so, we made it clear that an inability to legally marry did not preclude an equitable claim per se, and each claim had to be evaluated on its facts. *Id.* at 107-08. More importantly for purposes of this case, the *Vasquez* majority did *not* recognize the death of one party as a barrier to any equitable claim asserted in that case, including one based on the law of committed intimate relationships, a fact the dissent ignores.

¶26 In sum, over the past 90 years, when dealing with property distribution between partners in a committed intimate relationship, Washington common law has evolved to look beyond how property is titled, requiring equitable distribution of property that would have been community

property had the partners been married. But equity is limited; *only* jointly acquired property, but not separate property, can be equitably distributed. Finally, as the law of committed intimate relationships has developed, we have not objected to its application even where the relationship at issue terminated with the death of one partner rather than the dissolution of the relationship.

¶27 In this case, no party disputes that Cung and Thuy lived in a committed intimate relationship that would have been sufficient to justify equitable distribution of their jointly acquired property had their relationship terminated by dissolution rather than death. Relying in part on the reasoning in the *Vasquez* concurrences, Vu asserts that Washington's law of committed intimate relationships should *not* apply where *both* partners have died. Pet. for Review at 11-12. Similarly, the dissent relies on concurring opinions in *Vasquez* to argue that the law of committed intimate partnerships should not apply where the relationship has ended because of the death of either partner. Dissent at 673-74. They argue that the intestacy statutes alone should govern distribution of the property titled in each partner's name.

¶28 As the Court of Appeals made clear, this reasoning fails to take into account our basic framework for property distribution after death. *Olver*, 131 Wn. App. at 144-45. First, the decedent's property must be inventoried; a personal representative must determine what property belongs in the decedent's estate. RCW 11.44.015. Significantly, it was the *inventory* of Cung's estate that Olver challenged in this action on behalf of Thuy's estate. Clerk's Papers (CP) at 14 (Contradiction of Inventory). Only *after* the contents of the estate are established can the personal representative distribute the contents of the estate according to a valid will or the rules of intestacy. As the Court of Appeals aptly explained, "we do not look to the intestacy statutes to determine what the decedent owned." *Olver*, 131 Wn. App. at 144. Once a decedent's share is determined, "that partner's share is the estate upon which the inheritance rules will operate." *Id.* at 145.

¶29 As a result of the challenge to the inventory of Cung's estate, the trial court properly undertook the task of determining whether all of the property titled in Cung's name belonged only to him under Washington law. Once the trial court found that Cung and Thuy were in a committed intimate relationship, a fact not contested here, a mediator provided for the equitable division of the property between the entities that had stepped into Cung's and Thuy's shoes, their estates. CP at 358. The mediator, when announcing his decision, emphasized that in Cung's and Thuy's culture it was customary to title property in the male partner's name. CP at 365. Applying the law of committed intimate relationships, the mediator concluded that *all* of Cung's and Thuy's property had been acquired during their relationship, and despite title, Thuy was entitled to an undivided one-half interest in the jointly acquired property. CP at 358, 369. Because both partners were deceased, the property would be divided evenly between their estates. Only after the division of the couple's property could their estates be distributed according to applicable law. The record reflects that both Cung and Thuy had wills and each left his or her entire estate to the other, with no secondary beneficiaries. CP at 2, 15, 20. Under the uniform simultaneous death act, chapter 11.05 RCW, each partner is considered to have predeceased the other. RCW 11.05.010. Therefore both wills failed, and intestacy statutes control. *See* RCW 11.04.015.

¶30 Vu suggests that we hold that at the moment of death, a deceased partner in a committed, intimate relationship loses his or her equitable interest in jointly acquired property titled in the other partner's name. But this ignores the property rights of the deceased partner. In a marriage, each spouse has a present, undivided interest in the couple's community property. *Lyon v. Lyon*, 100 Wn.2d 409, 413, 670 P.2d 272 (1983). By analogy to community property law, Thuy had an undivided interest in the couple's jointly acquired property, even though it was titled in Cung's name. The death of one or both partners does not extinguish that right; Thuy's estate merely steps into her

shoes. As the *Brenchley* court explained 90 years ago, Cung's heirs should have no better rights than Cung would have, were he still alive. *Brenchley*, 96 Wash. at 226.

¶31 Vu also argues equitable division was unnecessary here because all of the family's property will go to Harry, regardless of which estate is the vehicle. However, regardless of how her estate will eventually be distributed, Thuy's interest in property she jointly accumulated with Cung should be honored. As the Court of Appeals recognized, "[t]he right to devise one's property and thereby transfer accumulated wealth is one of our society's most firmly guarded individual rights." *Olver*, 131 Wn. App. at 146. Thuy, and in her place her estate, should not be divested of that right simply because her heir and Cung's heir are the same. Ultimately, this case involves the equitable division of property between Cung's and Thuy's estates; the interests of third parties are not germane until it is time to determine how the estates should be distributed. *See Brenchley*, 96 Wash. at 226. Moreover, to the extent that her estate might shield assets for her son, Thuy is entitled to provide that benefit for her son if such a shield is indeed available. We conclude that the law of committed intimate relationships applies where both partners are deceased, allowing equitable division between the deceased partners' estates. We affirm the Court of Appeals and the probate court's division of the property.[8]

¶32 *Application of Joint Tort Liability to Committed Intimate Relationships*: Vu also argues that placing one half of the couple's jointly acquired property into Thuy's estate will effectively insulate that half of the community property from Cung's tort creditors, including Dianna. Pet. for Review at 2. No Washington court has addressed whether principles of joint tort liability apply to committed intimate

---

[8] Vu seems to argue in his supplemental brief that the trial court's equitable division was arbitrary. Suppl. Br. of Nguyen at 2-3. However, the mediator supported his equitable division with ample uncontested facts. CP at 368-69. Vu has not established that the trial court erred in dividing the property equally between the estates.

partners. The Court of Appeals declined to reach this question because the trial court did not rule on it and because the issue would be more appropriately addressed in Vu's pending suit against Thuy's estate. *Olver*, 131 Wn. App. at 146 n.41 (citing RAP 2.2(a)(1)); RP at 33.

¶33 Then at oral argument in this court, Olver submitted a copy of a trial court order barring Dianna's creditor's claim against the estate of Thuy. Order Barring Creditor's Claim at 1. Moreover, there is no evidence in the record as to whether the challenged claims of Vu or the estate of Dalena are still viable. *See* CP at 249-50 (noting that those claims were being challenged). If these potential creditors no longer have viable claims against Thuy's estate, then any holding made in the context of this case regarding the application of joint tort liability would be truly advisory. *E.g.*, *Wash. Educ. Ass'n v. Wash. State Pub. Disclosure Comm'n*, 150 Wn.2d 612, 622-23, 80 P.3d 608 (2003) (requiring actual, present, existing dispute that is not moot).

¶34 We too decline to reach this issue. The extent to which Cung's potential creditors can reach Thuy's estate would be more appropriately addressed in the context of a case against Thuy's estate. And if the potential creditors' claims in this case have been dismissed, then there is no existing controversy at this time.

## III

### Conclusion

¶35 The trial court did not abuse its discretion when it allowed Vu to intervene in this challenge to the inventory of Cung's estate. We hold that when a committed intimate relationship is terminated by the death of both parties, the couple's jointly acquired property can be equitably divided between the partners' estates. We decline to reach the issue

of the application of joint tort liability to committed intimate partners. We affirm.

C. JOHNSON, MADSEN, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.

¶36 SANDERS, J. (dissenting) — The majority holds Washington's meretricious relationship[9] case law provides a means to distribute property after both partners die. I disagree. We should adhere to our precedent to hold this doctrine applies only when both partners are alive and seek to dissolve their relationship.

¶37 The majority's holding will also circumvent a decedent's will if one partner in a meretricious relationship dies before another. Instead of respecting the decedent's wishes, the surviving partner will be unjustly enriched by an interest in any "community property." Because there is no actual marriage and the doctrine is not originally intended to include postdemise distribution, property should be distributed individually as per the rules of intestacy or by will.

¶38 The doctrine of meretricious relationships is a judicial one. William A. Reppy, Jr., *Choice of Law Problems Arising When Unmarried Cohabitants Change Domicile*, 55 SMU L. REV. 273, 278 (2002). We developed it in the absence of a statutory means of "resolving the property distribution issues that arise when unmarried persons, who have lived in a marital-like relationship and acquire what would have been community property had they been married, separate." *Vasquez v. Hawthorne*, 145 Wn.2d 103, 109, 33 P.3d 735 (2001) (Alexander, C.J., concurring) (citing *In re Marriage of Lindsey*, 101 Wn.2d 299, 678 P.2d 328 (1984)).

---

[9] Notwithstanding the majority's invention of a new term ("committed intimate relationships," majority at 657), the proper term is meretricious relationships because unlike an actual marriage, where there is a legal agreement between two people to be bound as husband and wife, a meretricious relationship is one "based on pretense." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1413 (2002). Our courts have used the term "meretricious" for over a century. *See In re Estate of McLaughlin*, 4 Wash. 570, 584, 30 P. 651 (1892) (" 'Mutual consent to enter into the relation of husband and wife was all that was essential. . . . But a marriage will not be presumed even where, for convenience, the parties hold themselves out as man and wife before third persons: *Provided*, Their cohabitation has the elements of a purely meretricious relation.' " (quoting 2 JOHN D. LAWSON, RIGHTS, REMEDIES, AND PRACTICE § 711 (1889))).

Courts apply the doctrine by analogy to RCW 26.09.080, which requires equitable distribution of both separate and community property "[i]n a proceeding for dissolution of the marriage." RCW 26.09.080; *see Vasquez*, 145 Wn.2d at 108-09 (Alexander, C.J., concurring) (citing *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995)). Before today, we have never applied the doctrine to justify a "post-demise distribution of property." *Vasquez*, 145 Wn.2d at 114 (Sanders, J., concurring). Indeed, we held nearly the opposite when we said the doctrine does not apply when the meretricious relationship is terminated by the death of one of the partners. *Peffley-Warner v. Bowen*, 113 Wn.2d 243, 253, 778 P.2d 1022 (1989).

¶39  In *Peffley-Warner* the sole issue was "whether Washington affords a woman partner in a 'meretricious' relationship the same status as a wife under the laws of intestate succession with respect to the personal property of the deceased partner." *Id.* at 245. We said no: "By common definition, a spouse is a marriage partner or a wife or husband. Marilyn E. Peffley-Warner and Sylvan F. Warner were neither. Theirs was a 'meretricious' relationship. Such a relationship is not a marriage. They were not spouses. They were not husband and wife. Therefore, because appellant is not a 'spouse,' she cannot receive a share of the estate of Sylvan F. Warner under the intestate succession laws of the state of Washington." *Id.* at 252-53 (citation omitted).[10]

---

[10] While surveying Washington meretricious relationship law, Professor Reppy notes the numerous differences between meretricious relationships and lawful marriages:

> The surviving cohabitant is not an heir able to make claims under the statutes of intestate succession, as could a lawful widow or widower. One cohabitant cannot recover for the wrongful death of the other. While a lawful spouse is not disqualified from receiving unemployment insurance compensation upon quitting her job to follow the other spouse to a new place of employment, a cohabitant who does the same is disqualified. A cohabitant cannot invoke the statute barring discrimination based on marital status. A divorced person receiving alimony does not forfeit the right to it by entering into a meretricious relationship in circumstances where by statute he or she would upon marrying the person with whom he or she begins living.

Reppy, *supra*, at 279-80 (footnotes omitted).

¶40 Our analysis in *Peffley-Warner* hinged on the fact Ms. Peffley-Warner was not actually Mr. Warner's wife or widow. Similarly neither Cung Ho nor Thuy Nguyen Ho would have spouse or widow status if either had survived because they were not married. The majority rightly notes when married partners die simultaneously, each is presumed to have predeceased the other and intestacy statutes control, majority at 670; however, that would not be the case here since there was no marriage. Therefore, neither partner could receive a share of the estate "under the intestate succession laws of the state of Washington" since the couple was not married. *Peffley-Warner*, 113 Wn.2d at 253.

¶41 The majority does not limit its reasoning to the atypical simultaneous death situation, nor can I see a principled distinction to be made. In the more common situation, one partner in a meretricious relationship will die before the other and might choose to leave their property to someone other than his or her partner. But the majority's broad reasoning would create a putative marriage where none truly exists. And instead of the deceased's property being distributed as per his or her will, the surviving partner (along with his or her creditors) will be unjustly enriched with a portion of any assets deemed "community property." This will deprive the rightful heirs of their full inheritance and negate the decedent's wishes as memorialized in his or her will.

¶42 The meretricious relationship doctrine is available only when a couple living in a marital-like relationship seek to dissolve the relationship and judicially distribute the property. Irrespective of when the property is inventoried and divided, this relief is no more available when both die than when one dies.

¶43 I dissent.

ALEXANDER, C.J., and J.M. JOHNSON, J., concur with SANDERS, J.